IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LEO PHARMA A/S, LEO LABORATORIES LIMITED, AND LEO PHARMA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 16-333-JFB-SRF |
| ACTAVIS LABORATORIES UT, INC., AND ACTAVIS, INC., | ) ) ) ) | **UNDER SEAL** |
| Defendants. | ) ) | |
| LEO PHARMA A/S, LEO LABORATORIES LIMITED, AND LEO PHARMA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 16-430-JFB-SRF |
| PERRIGO UK FINCO LIMITED PARTNERSHIP AND PERRIGO COMPANY, | ) ) ) ) ) | **UNDER SEAL** |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Presently before the court in this patent infringement action is the motion for issuance of a letter of request, filed by defendants Actavis Laboratories UT, Inc. ("Actavis"), Perrigo UK Finco Limited Partnership and Perrigo Company ("Perrigo") (collectively, "defendants"), requesting international judicial assistance to take document and deposition discovery from third party MedPharm Ltd. ("MedPharm"), pursuant to Federal Rule of Civil Procedure 28 and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the

"Hague Convention"). (D.I. 182)[1] Plaintiffs LEO Pharma A/S, LEO Laboratories Limited, and LEO Pharma, Inc. (collectively, "LEO" or "plaintiffs") oppose the motion. (D.I. 191) For the following reasons, defendants' motion for the issuance of a letter of request (D.I. 182) is granted.

## II. BACKGROUND

This action arises out of the submission of Abbreviated New Drug Application ("ANDA") Nos. 208807 and 209086 (together, "the Actavis ANDAs"), and ANDA Nos. 209018 and 209019 (together, "the Perrigo ANDAs"), which were filed by defendants with the U.S. Food and Drug Administration ("FDA") seeking approval to market generic versions of LEO's Picato® pharmaceutical products. (C.A. No. 16-333-JFB-SRF, D.I. 73 at ¶ 1; C.A. No. 16-430-JFB-SRF, D.I. 99 at ¶ 1) The Picato® products are gels containing ingenol mebutate as the active pharmaceutical ingredient ("API") at dosage strengths of 0.015% and 0.05%. (C.A. No. 16-333-JFB-SRF, D.I. 73 at ¶ 1) LEO Pharma is the holder of New Drug Application ("NDA") No. 202833 for ingenol mebutate gel at concentrations of 0.015% and 0.05%, which was approved by the FDA on January 23, 2012. (*Id.* at ¶ 13) LEO's Picato® products are approved for the topical treatment of actinic keratosis. (*Id.* at ¶ 16)

LEO filed Civil Action No. 16-333-JFB-SRF on May 6, 2016, and brought Civil Action No. 16-430-JFB-SRF on June 10, 2016, alleging that defendants infringed the patents-in-suit by filing their respective ANDA applications with the FDA. (C.A. No. 16-333-JFB-SRF, D.I. 1; C.A. No. 16-430-JFB-SRF, D.I. 1) The first amended complaint in Civil Action No. 16-430-JFB-SRF, brought against Perrigo, alleges infringement of twelve patents: U.S. Patent Nos. 6,787,161 ("the '161 patent), 6,844,013 ("the '013 patent"), 7,410,656 ("the '656 patent"),

---

[1] Unless otherwise noted, all docket entries cited in this Memorandum Opinion shall refer to Civil Action No. 16-333-JFB-SRF.

8,278,292 ("the '292 patent"), 8,372,827 ("the '827 patent"), 8,372,828 ("the '828 patent"), 8,377,919 ("the '919 patent"), 8,536,163 ("the '163 patent"), 8,716,271 ("the '271 patent"), 8,735,375 ("the '375 patent"), 9,416,084 ("the '084 patent"), and 9,676,698 ("the '698 patent") (collectively, the "patents-in-suit"). (D.I. 99 at ¶ 13) The second amended complaint in Civil Action No. 16-333-JFB-SRF, brought against Actavis, alleges infringement of the '656 patent, the '292 patent, the '827 patent, the '828 patent, the '919 patent, the '163 patent, the '271 patent, the '375 patent, the '698 patent, and the '084 patent, but omits the '161 patent and the '013 patent. (D.I. 73 at ¶ 8) LEO is the owner of, and has the right to enforce, the patents-in-suit. (*Id.* at ¶ 21) The patents-in-suit fall into three groups: (1) the Aylward Patents, (2) the Brown Patents, and (3) the Process Patents.

The Aylward Patents[2] are a group of related patents sharing a common specification and having one named inventor, James Harrison Aylward. The Aylward Patents are directed to methods of treating various cancerous conditions using certain ingenane compounds, including ingenol mebutate. ('656 patent, Abstract; col. 34:23-24) Dr. Aylward isolated compounds from certain species of Euphorbia, a genus of flowering plants used for traditional medicinal remedies, and discovered that angeloyl-substituted ingenanes could selectively kill cancer cells. (*Id.* at 4:62-5:1; 6:8-38) The claims of the '161 and '013 patents are directed to treating cancerous conditions with specific compounds obtained from the sap of Euphorbia species. ('161 patent, col. 31:22-32:35; '013 patent, col. 32:8-60) The claims of the '656 patent are more generally directed to isolated compounds. ('656 patent, col. 34:13-34)

---

[2] The Aylward Patents include the '656 patent, the '013 patent, and the '161 patent. (D.I. 142, Ex. A at 1)

3

The Brown Patents[3] share a common specification and name as inventors Marc Barry Brown, Michael Edwards Crothers, and Tahir Nazir. The Brown Patents are directed to topical skin cancer treatments. Specifically, the Brown Patents claim pharmaceutically acceptable formulations of ingenol-3-angelate combined with pharmaceutical solvents and excipients to achieve a stable form. ('292 patent, col. 1:60-67)

The '084 patent and the '698 patent, identified as the "Process Patents," cover methods of producing ingenol mebutate. (D.I. 73 at ¶ 20) The Process Patents are both entitled, "Method of Producing Ingenol-3-Angelate," they share a common specification and common inventors,[4] and both claim priority to Provisional Application No. 61/366,018, which was filed in 2010. (D.I. 106, Exs. 6-7) The '698 patent is a continuation of the '084 patent. (*Id.*, Ex. 7)

In the summer of 2017, defendants served individual, third-party subpoenas on three named inventors of the Brown Patents: Marc Brown, Michael Crothers, and Tahir Nazir. (D.I. 182, Ex. B) Dr. Brown is a co-founder and Chief Scientific Officer of MedPharm, an English corporate entity which contracted with LEO's predecessor, Peplin Operations Pty Ltd, in developing the ingenol mebutate product marketed as Picato®. (*Id.*, Ex. D at 2) Drs. Crothers and Nazir are former MedPharm employees. (D.I. 191, Ex. 1 at 47-48) Drs. Brown, Crothers, and Nazir agreed to voluntarily appear for depositions in response to the subpoenas, and produced a few documents in response to the subpoenas. Counsel for the inventors indicated that the majority of documents responsive to the subpoenas were in the possession of the inventors' former or current employers. (D.I. 182, Ex. B)

---

[3] The Brown Patents include the '292 patent, the '827 patent, the '828 patent, the '919 patent, the '163 patent, the '271 patent, and the '375 patent. (D.I. 142, Ex. A at 3)
[4] The named inventors of the Process Patents are Thomas Hogberg, Gunnar Grue-Sorensen, Xifu Liang, Anne Marie Hrneman, and Anders Karskov Petersen. (D.I. 106, Exs. 6-7)

In November 2017, prior to the depositions of the three inventors, defendants informed LEO of their intent to seek discovery directly from MedPharm pursuant to the Hague Convention. During Dr. Brown's deposition on November 15, 2017, he testified that MedPharm had transferred relevant documents to LEO several years ago, prompting LEO to renew its search for documents and produce documents found in an offsite storage facility on November 20, 2017. (D.I. 182, Ex. D at 11-14; D.I. 191, Ex. 1 at 14-16, 65-66) Dr. Brown also testified that MedPharm no longer employs any other person connected to the patents-in-suit. (D.I. 191, Ex. 1 at 48, 136-37) LEO opposes defendants' efforts to obtain discovery from MedPharm in England, alleging that the request is untimely, unduly burdensome, and cumulative of discovery already produced. (D.I. 182, Ex. F)

### III. LEGAL STANDARD

The Hague Convention "prescribes certain procedures by which a judicial authority in one contracting nation may request evidence located in another nation." *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 299 (3d Cir. 2004). The Hague Convention is not mandatory and "serves as an alternative or 'permissive' route to the Federal Rules of Civil Procedure for the taking of evidence abroad from litigants and third parties alike." *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 254 F. Supp. 2d 469, 472 (D. Del. 2003) (citing *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct., D. Iowa*, 482 U.S. 522, 538 (1987)).

In this district,

> "[a] party which seeks the application of the Hague [Evidence] Convention procedures rather than the Federal Rules [of Civil Procedure] bears the burden of persuading the trial court[] of the necessity of proceeding pursuant to the Hague Evidence Convention. That burden is not great, however, since the Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention."

5

*Pronova BioPharma Norge AS v. Teva Pharms. USA, Inc.*, 708 F. Supp. 2d 450, 452-53 (D. Del. 2010) (alterations in original) (quoting *Tulip Computers Int'l*, 254 F. Supp. 2d at 474). "When discovery is sought from a non-party in a foreign jurisdiction, application of the Hague [Evidence] Convention, which encompasses principles of international comity, is virtually compulsory." *Tulip Computers Int'l*, 254 F. Supp. 2d at 474 (alteration in original) (internal citation and quotation marks omitted).

In determining whether to utilize the Convention procedures, district courts are instructed to consider: (1) the particular facts of the case; (2) the sovereign interests involved; and (3) the likelihood that resort to the Hague Convention will prove effective. *Societe Nationale*, 482 U.S. at 544; *see also In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d at 301. Additional factors relevant to the court's decision include: "considerations of comity,[5] the relative interests of the parties including the interest in avoiding abusive discovery,[6] and the ease and efficiency of alternative formats for discovery." *Tulip Computers Int'l*, 254 F. Supp. 2d at 474 (citation and quotation marks omitted).

A letter of request, or "letter rogatory," from a United States judicial authority to the competent authority in a foreign state is one of three available methods of taking evidence under

---

[5] In *Societe Nationale*, the Supreme Court identified the following five factors to be considered in a comity analysis: (1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the requests; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the requests would undermine important interests of the United States, or compliance of the requests would undermine important interests of the state where the information is located. *Id.* 482 U.S. at 543-44 & n.28.

[6] *See Schindler Elevator Corp. v. Otis Elevator Co.*, 657 F. Supp. 2d 525, 529 (D.N.J. 2009) ("In evaluating whether to require resort to the Convention, courts should be mindful of 'unnecessary, or unduly burdensome, discovery' that may place foreign litigants in a disadvantageous position." (quoting *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d at 301)).

6

the Convention. *See id.* at 472 (citation omitted).[7] A letter rogatory "is the request by a domestic court to a foreign court to take evidence from a certain witness." *Ethypharm S.A. France v. Abbott Labs.*, 748 F. Supp. 2d 354, 358 (D. Del. 2010) (citation and quotation marks omitted). "Upon receipt of a Letter of Request, which must provide specific information regarding the lawsuit and the information sought to be discovered, the signatory state 'shall [then] apply the appropriate measure of compulsion' as is customary 'for the execution of orders issued by the authorities of its own country.'"[8] *Pronova BioPharma*, 708 F. Supp. 2d at 452 (alteration in original) (quoting *Tulip Computers Int'l*, 254 F. Supp. 2d at 472).

"The person to whom the discovery requests in a Letter of Request are directed has the right to 'refuse to give evidence' to the extent that the person has a privilege under the law of the State of execution or the State of origin." *Tulip Computers Int'l*, 254 F. Supp. 2d at 472 (citing Hague Evidence Convention, Art. 11); *see also Pronova BioPharma*, 708 F. Supp. 2d at 454.

The Third Circuit has explained that "the term[s] of [Fed. R. Civ. P. 28(b)] appear to give trial courts *limited* discretion to deny applications for the issuance of a [letter rogatory]." *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 890 (3d Cir. 1984). The Third Circuit reasoned:

---

[7] There are three available methods of taking evidence pursuant to the Convention:
    (1) by a Letter of Request or "letter rogatory" from a U.S. judicial authority to the competent authority in the foreign state . . . ,
    (2) by an American or foreign diplomatic or consular officer or agent after permission is obtained from the foreign state, and
    (3) by a private commissioner duly appointed by the foreign state.
*Tulip Computers Int'l*, 254 F. Supp. 2d at 472 (citation omitted).

[8] "Signatory states may refuse to execute a Letter of Request if the request 'does not fall within the function of the judiciary' or if the 'sovereignty or security' of the contracting state would be prejudiced but, execution 'may not be refused solely on the ground that under its internal law the State of execution claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not admit a right of action on it.'" *Tulip Computers Int'l*, 254 F. Supp. 2d at 472 (citations omitted).

7

> Prior to the 1963 amendment, Rule 28(b) said: "A commission or letters rogatory shall be issued *only when necessary or convenient*, on application and notice, and on such terms and with such directions as are just and appropriate." The amendment deleted the words "only when necessary or convenient" from the sentence. Although the Advisory Committee Note does not explain this change, it seems clear that the discretion trial courts formerly had in deciding whether to issue a commission or letters rogatory has been circumscribed.

*Id.* (citing Fed. R. Civ. P. 28(b)). The Third Circuit further explained that, "[a]lthough we do not dispute that it may be proper to refuse the issuance of . . . letters rogatory, there are cases in which courts have indicated that there must be some 'good reason' justifying the denial of this particular type of judicial assistance." *Id.* (citations omitted); *see also Ethypharm S.A. France*, 748 F. Supp. 2d at 358 ("Courts have found 'that some good reason must be shown by the opposing party for a court to deny an application for a letter rogatory.'" (citing *DBMS Consultants Ltd. v. Computer Assocs. Int'l, Inc.*, 131 F.R.D. 367, 369 (D. Mass. 1990))).

"In entertaining a request of letter pursuant to the Hague Convention, '[t]he exact line between reasonableness and unreasonableness in each case must be drawn by the trial court, based on its knowledge of the case and of the claims and interests of the parties and the governments whose statutes and policies they invoke.'"[9] *Purdue Pharma Products L.P. v. Par Pharm., Inc.*, C.A. No. 07-255-JJF, 2008 WL 3926158, at *1 (D. Del. Aug. 26, 2008) (quoting *Societe Nationale*, 482 U.S. at 546); *see also Abbott Labs. v. Teva Pharm. USA, Inc.*, C.A. No. 02-1512-KAJ, 2004 WL 1622427, at *3 (D. Del. July 15, 2004) (same). Furthermore, "[o]n an application for the issuance of a letter rogatory seeking a deposition in a foreign country, the Court will not ordinarily weigh the evidence to be elicited by deposition and will not determine

---

[9] Additionally, Fed. R. Civ. P. 28(b), which authorizes foreign discovery, "must be read together with Rule 26(c), which permits a court to make any order 'which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *Ethypharm S.A. France*, 748 F. Supp. 2d at 359 (D. Del. 2010) (citations omitted).

8

whether the witness will be able to give the anticipated testimony." *AstraZeneca v. Ranbaxy Pharm., Inc.*, 2008 WL 314627, at *2 (D.N.J. Jan. 29, 2008) (internal citations and quotation marks omitted).

## IV. DISCUSSION

### A. Production of Documents

Defendants seek document discovery from MedPharm pursuant to the Hague Convention regarding "the work performed at MedPharm by Marc Brown, Michael Crowthers [sic], and Tahir Nazir in developing pharmaceutically-acceptable, topical formulations of ingenol mebutate [which] resulted in the subject matter of the Brown Patents." (D.I. 182, Ex. A at 13) According to defendants, LEO's belated production of relevant documents following the deposition testimony of Dr. Brown illustrates the necessity of obtaining documents directly from MedPharm to ensure that LEO's production "constitutes the entirety of what MedPharm ostensibly provided to LEO." (D.I. 182 at ¶ 9) MedPharm is a non-party to this action, located in the foreign jurisdiction of England. (*Id.*) Consequently, defendants maintain that application of the Hague Convention procedures is appropriate. (*Id.*) In response, LEO opposes the breadth and cumulative nature of the discovery sought pursuant to defendants' motion, noting that the relevant documents formerly in MedPharm's possession have been produced by LEO. (D.I. 191 at ¶¶ 10-11)

In the present case, defendants have met their burden of establishing the necessity of proceeding pursuant to the Hague Convention. As this court has previously recognized, the moving party's burden is "not great," because "the Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the

9

Convention." *Pronova BioPharma*, 708 F. Supp. 2d 450, 452-53 (internal citation and quotation marks omitted). Furthermore, the scope of discovery permitted under Rule 26(b) is broad:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and is proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). The discovery sought from MedPharm is relevant, and comports with Fed. R. Civ. P. 26(b)(2)(C). Moreover, as a non-party located in a foreign jurisdiction, the Convention provides the only means of compelling discovery from MedPharm. *See Tulip Computers Int'l*, 254 F. Supp. 2d at 474 ("When discovery is sought from a non-party in a foreign jurisdiction, application of the Hague [Evidence] Convention, which encompasses principles of international comity, is virtually compulsory." (citation and internal quotation marks omitted)).

Defendants seek the following document discovery from MedPharm:

1. Documents which record Your past or current contractual, employment, business, and/or financial relationships with LEO and/or Peplin.

2. Documents which record Your past or current relationship with any third party related to the research, development, manufacture, production, and/or isolation of compounds from Euphorbia species, including specifically any ingenane-based compound.

3. Documents which record formulations that contained any ingenane-based compound, including ingenol mebutate, received and/or acquired from LEO and/or Peplin.

4. Documents which record formulations that contained any ingenane-based compound, including ingenol mebutate, received and/or acquired from any Third Parties, including, but not limited to, Dr. Ogbourne, Commonwealth Scientific and Industrial Research Organisation, Queensland Institute of Medical Research and the University of Queensland.

10

5. Documents which record any formulations containing any ingenane-based compound developed, tested, and/or analyzed by You, including ingenol mebutate.

6. Documents which record the conception, reduction to practice, and development of the claimed subject matter of the Brown Patents.

7. Documents which record the experiments and work described in the Brown Patents, including:

> (a) Documents which record the design and determination of the HPLC conditions described in the specification of the Brown Patents, including the choice of solvents and buffers, flow rate, run time, and column type and length;
>
> (b) Documents which record the research, investigation, evaluation, testing, analysis or experimentation performed to determine the stability of ingenol mebutate over time and at varying temperatures;
>
> (c) Documents which record the research, investigation, evaluation, testing, analysis or experimentation performed to determine the effect of pH on the stability of ingenol mebutate; and
>
> (d) Documents which record the research, investigation, evaluation, testing, analysis or experimentation performed to determine the difference between apparent pH and pH.

8. Documents which record the study, testing, determination, and/or analysis of the purity of ingenol mebutate, including, but not limited to, the design and development of any HPLC protocols used.

9. Documents which record the research, investigation, evaluation, testing, analysis or experimentation performed to determine the effect of storage temperature on the stability of ingenol mebutate.

10. Documents which record the research, investigation, evaluation, testing, analysis or experimentation performed to determine the effect of pH on the stability of ingenol mebutate.

11. Documents which record the research, investigation, evaluation, testing, analysis or experimentation performed to determine the effect of apparent pH on the stability of ingenol mebutate.

12. Documents which record the ingenol mebutate formulation(s) used in the work and experiments described in the Ogbourne Article, including but not limited to:

11

(a) Documents which record the pH of the formulation of "3-ingenyl angelate" described in the Ogbourne Article;

(b) Documents which record any data and/or results relating to the subject matter of the Ogbourne Article that were not published therein;

(c) Documents which identify the components of any formulation of "3-ingenyl angelate" used or described in the Ogbourne Article, including any acidifying agents used therein;

(d) Documents which record stability tests performed on any formulation of "3-ingenyl angelate" used in the experiments described in or related to the subject matter of the Ogbourne Article;

(e) Documents which record the method of using "3-ingenyl angelate" to treat skin cancer and/or solar keratosis in the experiments described in or related to the subject matter of the Ogbourne Article; and

(f) Documents which record the purity level of "3-ingenyl angelate" in any formulations used or described in the Ogbourne Article.

13. Documents which record the contributions of any person, including to [sic], but not limited to, Natalie Brine, Peter Parsons, James Aylward, and Steven Ogbourne, to the subject matter claimed in the Brown Patents, including facts relating to the decision whether to include any person as an inventor of the Brown Patents.

14. Documents which record Your discovery, testing, and analysis of migration of ester groups on ingenane-based compounds, including ingenol mebutate.

15. Documents which record any ingenane-based compound, including ingenol mebutate, in Your possession on and/or prior to December 16, 2005.

16. Documents which record any ingenane-based compound, including ingenol mebutate, in Your possession after December 16, 2005.

17. Publications, conference papers, presentations, technical bulletins, articles, books, and other published or publicly-distributed materials authored or co-authored by You related to the claimed subject matter of the Brown Patents.

18. Documents which record Your involvement and/or role in conceiving, reducing to practice, and/or developing methods of using compounds obtainable from *Euphorbia* species (including ingenane-based compounds) to treat any form of cancer or skin disease, including specifically actinic keratosis.

12

19. Documents which record any ingenol mebutate formulation(s) that You played a role in developing or creating, including any used in clinical studies.

20. Documents which record any ingenol mebutate formulations that You delivered, transferred, sold, and/or disclosed to any Third Parties, including, but not limited to, Allergan or QIMR Berghofer Medical Research Institute (also known as QIMR or Queensland Institute of Medical Research).

21. Documents which record any qualitative, quantitative, or structural analyses performed by You or under Your direction or supervision related to any PEP005 material received from Peplin or other third-party.

22. Documents which record the testing, study, determination, and analysis of the permeation rate of ingenol mebutate across the skin or any part thereof, including formulations thereof.

23. Copies of all certificates of analysis and/or specifications relating to any PEP005 or ingenol mebutate received from Peplin.

24. Documents which record the state of the art on or prior to December 16, 2005 relating to: (1) compounds obtainable from *Euphorbia* species (e.g., ingenane-based compounds); (2) their mechanism(s) of action; and (3) their use to treat cancer and/or skin diseases, including without limitation, solar keratosis and actinic keratosis.

25. Documents which record Your role in and knowledge of the preparation, filing, or prosecution of patent applications related to the Brown Patents.

26. Communications between You and LEO and/or Peplin that refer to or relate to LEO, its Products, Peplin or any compounds obtainable from *Euphorbia* plants, including specifically ingenane-based compounds.

27. Communications between You and any Third-Party that refer to or relate to LEO, its Products, Peplin or any compounds obtainable from *Euphorbia* plants, including specifically ingenane-based compounds.

(D.I. 182, Ex. A at Ex. C, 7-12)

The court grants the above requests to the extent that the documents have not already been produced in response to the discovery requests or following the deposition of Dr. Brown. These requests are not overly burdensome in amount or scope given their undisputed relevance to the Brown Patents. Although Dr. Brown testified that all such documents were transferred

13

from MedPharm to LEO several years ago, LEO was unable to locate any of the documents prior to Dr. Brown's testimony, and defendants should be given the opportunity to independently verify Dr. Brown's statements.

### B. Deposition Testimony

Defendants also seek deposition testimony from a MedPharm corporate witness capable of providing a foundation or authentication of the requested document production. (D.I. 182 at ¶ 9) According to defendants, the testimony of such an informed corporate representative differs in scope and import from the testimony of the individual inventors of the Brown Patents. (*Id.* at ¶ 17) LEO objects to the deposition request, alleging that the testimony of a MedPharm corporate witness will be duplicative of Dr. Brown's testimony, and indicating that defendants will soon have the opportunity to depose Dr. Crothers and Dr. Nazir as former MedPharm employees who worked on the relevant projects. (D.I. 191 at ¶ 10)

The court grants defendants' request for the issuance of process to compel the deposition testimony of a corporate witness of MedPharm under the Hague Convention. The testimony of a corporate witness from MedPharm is warranted to address the documents that will be produced by MedPharm in accordance with the document requests. Such testimony is not duplicative of testimony by the individual inventors of the Brown Patents. *See Ethypharm S.A. France v. Abbott Labs.*, 271 F.R.D. 82, 90 (D. Del. 2010) ("A 30(b)(6) witness is 'speaking for the corporation,' and this testimony must be distinguished from that of a 'mere corporate employee' whose deposition is not considered that of the corporation and whose presence must be obtained by subpoena.").

14

## V. CONCLUSION

For the foregoing reasons, defendants' motion for issuance of letters rogatory (D.I. 182) is granted. An Order consistent with this Memorandum Opinion shall issue.

Given that the court has relied upon material that technically remains under seal, the court is releasing this Memorandum Opinion under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Memorandum Opinion should be redacted, the parties should jointly submit a proposed redacted version by no later than **February 26, 2018**. The court will subsequently issue a publicly available version of its Memorandum Opinion.

This Memorandum Opinion is filed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a), and D. Del. LR 72.1(a)(2). The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Memorandum Opinion. Fed. R. Civ. P. 72(a). The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, www.ded.uscourts.gov.

Dated: February 12, 2018

Sherry R. Fallon
United States Magistrate Judge

15